[S. F. No. 1901.  Department One.—January 31, 1902.]

## A. C. HAMMOND, Jr., Appellant, v. CITY OF SAN LEANDRO et al., Respondents.

MUNICIPAL BONDS—ELECTRIC LIGHT FOR STREETS AND PARKS—STATUTORY CONSTRUCTION—"MUNICIPAL IMPROVEMENT."—A city of the sixth class has the power to.issue bonds for the purpose of supplying electric light about the public streets, parks, places, and buildings of the city.  The power given by the act of March 13, 1883, to light the city, implies the power to use the means necessary to accomplish that object, and the term "municipal improvement," used in the act of March 19, 1899, authorizing a bonded indebtedness for "any municipal improvement," embraces the improvement of electric lights.

ID.—ELECTRIC-LIGHT PLANT—PLANS AND SPECIFICATIONS—RECITALS OF ORDINANCES—PRESUMPTIONS—BURDEN OF PROOF.—Where the ordinances relating to the bond issue recited the public interest and necessity for the construction of an electric-light plant at a specified cost, and that the board of trustees has had plans and estimates of the cost.made by a competent architect of statutory qualifications set forth, and ordered an election, at which the bond issue was authorized, it must be presumed that the board performed its duty, and that the person or persons making the plans and estimates had the requisite qualifications, and the burden of proof is upon a plaintiff assailing the bond issue to overcome these presumptions.

ID.—PLANS AND ESTIMATES BY DIFFERENT PERSONS—WRITING NOT ESSENTIAL—PURPOSE OF STATUTE—COST OF IMPROVEMENT.—Proof that plans and estimates of cost of different parts of the work were made by different persons not shown to be disqualified, and that no written plan or specifications of a complete plan were made and filed by any one person, where it appears that all of the plans and specifications made were before the board and were adopted by it, does not overcome the presumptions in favor of the action of the board and of the statutory qualifications of such persons.  The statute does not require written plans and specifications; and the purpose of the statute is to inform the board of such facts as will enable the trustees to fix the cost of the improvement to be submitted to the voters.

ID.—HOURS OF ELECTION—TIME FOR CLOSING POLLS—REFERENCE TO POLITICAL CODE—EFFECT OF AMENDMENT.—The act of 1883, which authorized the trustees to provide for the lighting of the streets, and required all municipal elections to be held "in accordance with the general election laws of the state," did not, in effect, incorporate section 1160 of the Political Code as it then stood, requiring the polls to be kept open until sunset; and an amendment closing the

general elections at five o'clock P. M. changed the hour of closing
municipal elections; and it was proper to close the polls at an elec-
tion for a bond issue under the act of 1899 at that hour.

APPEAL from an order of the Superior Court of Alameda
County denying a new trial. F. B. Ogden, Judge.

The facts are stated in the opinion.

J. W. Goodwin, for Appellant.

Stephen G. Nye, for Respondents.

CHIPMAN, C.—Injunction. Plaintiff was nonsuited, and
he appeals from the order denying his motion for a new trial.

Defendant took proceedings to bond the city of San
Leandro, a city of the sixth class, for the purpose of supplying
electric lights, "about the public streets, parks, places, and
buildings of said city," under the provisions of the act of
March 19, 1899, (Stats. 1899, p. 399). The objections to the
proceedings now urged are: 1. That the act does not give
authority to the city to issue bonds for this purpose; 2. Sec-
tion 4 of the act makes it "the duty of the legislative branch
of any municipality contemplating permanent improvements
to first have plans and estimates of the cost of such improve-
ments made by a competent engineer or architect who has
had successful experience in such work before the question of
incurring an indebtedness for such improvements is sub-
mitted to vote," and it is claimed this was not done; and 3.
That the polls at the election were kept open after sunset.

1. Appellant relies on the point that the only power con-
ferred by the act of 1889 to create an indebtedness is found
in section 2 of the act, which mentions specifically certain
improvements that may be made (among which lighting
cities is not one), and adds to these "other municipal im-
provements." This latter phrase, it is contended, can apply
to such improvements only as are *ejusdem generis* of those
recited in the section. (Citing Sutherland on Statutory Con-
struction, sec. 268.) But the grant of power is to be found in
section 1, which provides that "any city, town, or municipal
corporation . . . may, as hereinafter provided, incur indebt-
edness to pay the cost of any municipal improvement, or for
any purpose whatever requiring an expenditure greater than

the amount allowed for such improvement by the annual tax levy.'' Section 2 is not intended as a limitation upon the power conferred by section 1, and this, we think, is shown by the fact that in section 2, after enumerating certain improvements, the terms used in section 1 are added. Section 862 of the act of March 13, 1883, subdivision 4, expressly provides that the trustees have power to establish streets, alleys, and places in the city, and to light the same. (Stats. 1883, p. 269.) The power to light the city implies also the power to use the means necessary to accomplish that object. Whatever may be the limit that should be placed upon the terms ''any municipal improvement,'' we think they clearly embrace the improvement here contemplated. *Von Schmidt* v. *Widber,* 105 Cal. 151, cited by appellant, lays down no rule in conflict with this construction of the statute.

2. In plaintiff's complaint the ordinances passed by the trustees of defendant relating to this bond issue are set forth. In these·the necessity for the improvement is declared, and that the public interest and necessity demand the construction of an electric-light plant, the cost of which was fixed at ten thousand dollars, and it was recited that the ''board of trustees have had plans and estimates of the cost . . . made by a competent architect who has had successful experience in such work, and which plans and estimates have been adopted, . . . and are now on file in the office of the city clerk of said city.'' Ordinance 46, ordering the election, among other things, was passed November 4, 1895, and the election was held December 16, 1895, at which more than two thirds of the electors voted in favor of the bond issue. The foregoing facts are presumed to be true, and it devolved on plaintiff to show that some material duty was omitted in order to overcome this presumption. As to plaintiff's second point now before us, there is no evidence except such as was introduced by plaintiff. Witness Williams testified that he had been city clerk for five years next previous to the trial (which was on April 20, 1896); ''that the only plans for the construction of an electric-light plant which were ever submitted to the board of trustees . . . prior to January 16, 1896, as far as he could remember, were submitted to the said board on the second day of September, 1895, by John Driver, and at the same time plans were adopted for an engine''; that ''no

one ever submitted . . . any written estimate of the cost of the construction and acquisition of an electric-light plant for said city, but that one Scrivener gave to the board of trustees at their regular meeting held September 2, 1895, a verbal estimate of the cost of an electric-light plant for said city, . . . at the request of said board." John Driver testified that he was a draftsman by trade; that he has had twenty-five years' experience in the matter of building and constructing engines and their cost, and "was familiar with the cost of the erection of dynamos and engines for driving dynamos"; that he submitted plans and estimates to the board for a building twenty by forty feet and plans for an engine, and they were the only plans he submitted; that he was not familiar with what would be necessary for a complete electric plant; "that he had an electrician make out the specifications and plans for the rest of the plant (other than the engine and building), and they were adopted by the board." Whether this was Scrivener or some other electrician, does not appear. This was all the evidence. It sufficiently appears that there were no *written* plans and specifications of a complete plan filed made by any one person. But it appears that an electrician made out plans and specifications for the plant, except for the engine and building, and as to these Driver made plans and specifications. It appears that plans and specifications were before the board and adopted, though submitted by different persons. There is no evidence that the persons making these plans did not possess the statutory qualifications. The presumption from the action of the board is that the persons who made the plans did possess the requisite qualifications, and it was incumbent on plaintiff to overcome this presumption by evidence. He failed to do so. The statute of 1889 (sec. 4) makes it the duty of the board "to first have plans . . . made by," etc. The act does not call for *written* plans and specifications. The purpose of the act is to inform the board of such facts as will enable the trustees to fix the cost of the improvement to be submitted to vote. Doubtless, written plans and specifications would be more satisfactory than verbal ones, and we think such should be procured by the trustees. But we cannot say that bonds would be illegal where such form of information was not placed on file. It would be quite possible for the clerk to take down the verbal

statements so as to enable the board to act intelligently. So far as the building and engine were concerned plans were submitted apparently in writing, and it would seem that the plans for the electric appliances were so submitted, but this is not quite clear. The evidence that there were no written plans seems to be addressed to the question whether such plans were submitted of a completed plant as a whole, and not as to the several parts of a plant. However, we think plaintiff failed to sustain his contention. He nowhere alleged, and it was not shown by evidence, that the plans as adopted were unsuitable or of excessive cost, or were in any way not adapted to the object the board had in view.

3. The allegation that the polls were closed at 5 o'clock P. M., and that sundown occurred on the day of election at forty-one minutes past 4 P. M., is not denied. The point made is, that the polls should have closed at sundown. Section 856 of the act of 1883 required all elections to be held "in accordance with the general election laws of the State." At that time section 1160 of the Political Code required the polls to "be kept open until sunset." But by this section, as amended in 1889, the requirement was, that the polls "must be kept open until 5 o'clock on the afternoon" of the day of election. Section 4 of the act of March 19, 1889, *supra*, relating to bonded indebtedness of municipalities, provides that such election shall be held as provided by law for holding such elections in such city," etc.

Appellant claims that the act of 1883, in effect, incorporated section 1160 into the act, and that the amendment of that section in 1889 did not affect the act of 1883 in respect of the time for closing the polls. We cannot agree with appellant. The purpose of the act of 1883 was to make the hours of the election in municipalities uniform with the hours in state elections, and not to incorporate the section of the Political Code into the act. When the hour of closing the general elections was changed to 5 o'clock P. M., it necessarily changed the hour of closing the municipal elections.

It is advised that the order be affirmed.

Cooper, C., and Haynes, C., concurred.

For the reasons given in the foregoing opinion the order is affirmed.        Garoutte, J., Van Dyke, J., Harrison J.